582 A.2d 137 (1990)
In re Judicial Review of S.A.
No. 89-225.
Supreme Court of Vermont.
August 24, 1990.
*138 Jeffrey L. Amestoy, Atty. Gen., Montpelier, and Joseph L. Winn, Asst. Atty. Gen., Brandon, for plaintiff-appellee Dept. of Mental Health.
John H. Carnahan of Fitts, Olson, Carnahan, Anderson & Bump, Brattleboro, for defendants-appellants S.A.'s parents.
Nancy Breiden, Vermont Legal Aid, Inc., Brandon, for defendant-appellee S.A.
Allan R. Keyes and John A. Serafino of Ryan Smith & Carbine, Ltd., Rutland, for amicus curiae, Brandon Training School Ass'n.
Mickenberg, Dunn, Sirotkin & Dorsch, Burlington, for amici curiae, Vermont Developmental Disabilities Council, Vermont Protection and Advocacy, Inc. and Vermont Ass'n for Retarded Citizens.
Before ALLEN, C.J., PECK, GIBSON and DOOLEY, JJ., and BARNEY, C.J. (Ret.), Specially Assigned.
PECK, Justice.
The parents of S.A. appeal a district court judgment finding their son, S.A., eligible for conditional release to a community placement. We affirm.

*139 I.
S.A., age 44, has lived at Brandon Training School (Brandon) since age 4, after he suffered postinfectious encephalitis that damaged his central nervous system and left him profoundly mentally retarded. He requires twenty-four hour care and supervision due to his considerable health problems, including a seizure disorder that has caused fractures and osteomyelitis. The fracture of his mandible many years ago has remained an ongoing health concern because S.A. must wear a helmet at all times when he moves about. S.A.'s general level of ability corresponds to that of a young child. His gross motor skills enable him to get in and out of bed and walk on level surfaces, but he cannot climb or descend stairs. S.A.'s fine motor development has progressed to the level of opening "push" doors and grasping small items with his thumb and fingers. Although he is nonverbal, S.A. communicates through vocalizations, listens at least momentarily when spoken to by a caregiver, and smiles in response to the presence of familiar people. He does not, however, understand the word "no," or imitate sounds immediately. He also tends to wander unless closely supervised. S.A. has continued to learn during his adult years despite his severe handicaps: between 1972 and 1976 he learned to walk again after being nonambulatory for more than thirteen years.
Appellants were appointed S.A.'s coguardians in 1981 pursuant to 14 V.S.A. §§ 3069(b)(1) (power of general supervision, including choosing or changing his residence, care, habilitation, education, and employment) and 3069(b)(5) (power of consent to surgery or other medical procedures). The present controversy developed because appellants, S.A.'s parents, were not notified of the application for judicial review filed in the district court by the Attorney General, on behalf of the Department of Mental Health (DMH), on August 2, 1984. Appellants first learned that the application had been filed in March of 1988, when a paralegal from the Attorney General's Office wrote to them of the tentative judicial review hearing date set for April 7, 1988. They contend that as S.A.'s legal guardians they should have received notice of the application filing and had an opportunity to attend hearings at which the trial court assigned Vermont Legal Aid, Inc. (Legal Aid) as counsel for S.A., appointed a guardian ad litem, and three status conferences held in December of 1987, January and February of 1988.
Appellants claim on appeal that the court violated S.A.'s due process rights by failing to assure that he received an independent guardian ad litem and an independent lawyer and that the court overlooked their responsibilities and authority as S.A.'s legal guardians. They further assert that no legal standard exists making Brandon residents "eligible for conditional release" to community placements and, in the alternative, that even if such a legal standard does exist, the order finding that S.A. met this standard was inconsistent with the court's own findings of fact.

II.

A.
Appellants contend that their procedural due process rights were first disregarded when DMH failed to notify them of the filing of the judicial review application in August of 1984. Appellants' due process rights include the right to reasonable notice under the circumstances and an opportunity to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950).
Appellants have not shown that they were harmed in any way by not being included in the prehearing proceedings. Appellants received notice of the tentative hearing date, and the court granted them a continuance. The court also granted appellants a hearing on the issue of the appointment of an independent guardian ad litem and counsel. The statute requires notice to parents and guardians only of the scheduling of a hearing on the application. Section 8834(c) of Title 18 provides that the court "shall fix a date for and give notice of a hearing to ... the person admitted to *140 the training school and [the] attorney, legal guardian and spouse, parents or children." (Emphasis added.) The statute was complied with in this case. Appellants have not shown that they were injured in any way by the procedures defined by § 8834(c).[1]
Appellants also complain that the hearing was scheduled for more than three years after the application was filed, and not within the thirty days required by 18 V.S.A. § 8834(c). Appellants have presented no specific assertions of prejudice related to that delay.

B.
Appellants further contest the lack of appointment of and notice to a guardian ad litem earlier in the review process. They view the procedure employed in this case as "a standardized routine" that ignored the rights of S.A. to be treated as an individual as prescribed by statute and procedural due process and that treated the guardian ad litem as mere "window dressing." Specifically, they claim that the sequence of appointing counsel prior to appointing a guardian ad litem precluded S.A., through his guardian ad litem,[2] from electing to retain counsel pursuant to 18 V.S.A. § 7111, if he could afford it. We disagree. The court committed no procedural errors by appointing counsel before a guardian ad litem.
The statutes differ with respect to the appointment of counsel and of a guardian ad litem. Section 7111 requires a Brandon resident to be represented by counsel "[i]n any proceeding." In contrast, § 8831 states that no commitment order "shall lead to a presumption of legal incompetence." Since the court has an obligation to appoint a guardian ad litem only for an incompetent person, V.R.C.P. 17(b), the appointment of a guardian ad litem in a judicial review proceeding depends upon a preliminary finding of legal incompetence by the court. Similar statutes concerning institutionalized persons appear elsewhere in Title 18. See, e.g., § 7706 (care and treatment of mentally ill or mentally retarded persons) and § 8844 (care for retarded persons who present a danger of harm to others). These provisions are designed to protect the liberty interests of an institutionalized person because they require courts to make specific findings on the issue of competency and not rely on "[m]ere recitations of diagnostic labels." State v. Ladd, 139 Vt. 642, 643-44, 433 A.2d 294, 295 (1981). They also encourage lawyers to "obtain ... all possible aid" from a client, if the client is "capable of understanding the matter in question or of contributing to the advancement of his [or her] interests" even if the client may be "legally disqualified from performing certain acts." Code of Professional Responsibility EC 7-12. If counsel cannot communicate with the client, then counsel should ask the court to appoint a guardian ad litem. Reading §§ 7111 and 8831 together, as we must, In re S.B.L., 150 Vt. 294, 301, 553 A.2d 1078, 1083 (1988), we conclude that the court may appoint counsel before a guardian ad litem.
Moreover, the statute makes no express provision for the court to specifically inquire into whether the guardian ad litem actually made a choice on S.A.'s behalf between retained and appointed counsel.[3] In ruling on appellants' motion, the court found that the guardian "generally approves" of Legal Aid's position in the case. Only limited circumstances, such as entering a guilty plea, require the court to affirmatively question a party to a proceeding *141 as to his or her decision-making considerations. The court had no further obligation in the present case to ask the guardian ad litem whether she had chosen appointed counsel over retained counsel.

III.
Appellants next dispute the existence of a legal standard labeled "eligible for conditional release." Alternatively, appellants maintain that even if such a legal standard does exist, the order finding that S.A. met this standard was inconsistent with the court's own findings of fact.

A.
Appellants argue that the decision In re R.B., Nos. 27, 28, 44, 17, 13, 47-78 BR-MR-JR (Brandon District Ct. 1980), relied on by the trial court improperly refers to a standard not contained in the statutes or legal decisions. Although S.A.'s eligibility for conditional release was clearly the ultimate issue to be resolved in the hearing, appellants never raised the legitimacy of this standard at the hearing and thus failed to preserve the issue for appeal. See Hinckley v. Town of Jericho, 149 Vt. 345, 346, 543 A.2d 260, 261 (1988). We nevertheless consider it in order to determine whether there were errors of such significance as to make the proceedings fundamentally unjust. See V.R.C.P. 61. For the following reasons, we conclude that the actions by the trial court were fair.
The "eligible for conditional release" standard was first discussed in In re M.G., 137 Vt. 521, 526, 408 A.2d 653, 656 (1979). M.G. explained that the statute appellants challenge in the present case[4] actually "embraces a larger purpose" than simply what happens to a Brandon resident upon release. Id. 18 V.S.A. § 8834(f) provides:
If the court does not order the person's admission to continue, it may order further hearings or may appoint experts or may order that the person be discharged. An order of discharge may be conditional or absolute and may have immediate or delayed effect.
M.G. interpreted the words "conditional or absolute discharge," and articulated as follows the standard appellants now contest.
This first review of the students is the initial step in determining which of the student population should not be confined to Brandon Training School under the law. This particular screening will, of course, result in the largest number of students suitable for discharge. It is more probable than not that the procedures for review may operate more speedily than the more involved placement process. Yet, at the same time eligibility must be recognized and provided for. Once the student population has all been reviewed and disposition made, the pattern of review and release will have a smaller and more predictable dimension.
M.G., 137 Vt. at 526-27, 408 A.2d at 656 (emphasis added). Section 8834(f) allows for both delayed and conditional release; "eligible for conditional release," reasonably read, denotes the same idea.
Courts construe statutes as part of their judicial function, primarily to determine and execute the intent of the legislature. See In re S.B.L., 150 Vt. at 301, 553 A.2d at 1083. When interpreting the words of the legislature, courts often set forth standards not explicitly articulated by statute. See, e.g., Peabody v. P.J.'s Auto Village, Inc., 153 Vt. 55, 57, 569 A.2d 460, 462 (1989) (Court sets forth three-part test explaining the words "deceptive acts or practices" in 9 V.S.A. § 2453(a)). The Court ascertains the meaning of a statute by considering "every part of the statute, the subject matter, its effects and consequences, and the reason and spirit of the law." In re R.S. Audley, Inc., 151 Vt. 513, 519, 562 A.2d 1046, 1049 (1989).
In describing the "eligible for conditional release" standard based on our understanding of the statute, we stated that courts must apply the less-restrictive-environment *142 standard "within broad limits." M.G., 137 Vt. at 526, 408 A.2d at 656.
Not even the statutory language can be fine-tuned enough to distinguish between the varying needs and circumstances of each of the patients. No matter how varied the community resources are, or how extensive the state support of the community release programs, there will likely always be students whose care requires a judgmental evaluation as to the suitability of available resources. We agree that the state cannot fulfill the stated statutory purposes by limiting the available dispositions to either total discharge or retention at Brandon.

Id. (emphasis added). We conclude that in the present case the court properly looked to the "eligible for conditional release" standard in ruling on S.A.'s application for judicial review and followed § 8834(f). The court thus committed no fundamental error.

B.
In reviewing appellants' final claim, we must determine: (1) whether the court erroneously concluded that S.A. proved by clear and convincing evidence that the measure of restraint of Brandon was not in the best interests of S.A., M.G., 137 Vt. at 527, 408 A.2d at 656, and (2) whether the court made a reasonable inquiry as to the availability of appropriate care, treatment, education, habilitation and remedial care in a less restrictive environment, 18 V.S.A. § 8834(e).[5]
The record reflects ample evidence that S.A.'s needs can be met in an appropriate community placement. The testimony at the hearing included concurrence on the part of all three experts, Dr. Ravaris for appellants, along with Dr. Hamilton and Jay Spiegel for Legal Aid, that S.A. would benefit from an environment with a higher staff to student ratio. Hamilton and Spiegel agreed that such an environment would be available in a six-bed community facility with a staff to student ratio of 1:3 or better, while at the same time providing the twenty-four hour care and supervision essential to S.A.
Hamilton, an expert with extensive experience with profoundly retarded persons who have seizure disorders, opined that institutional living has inhibited S.A.'s adaptive skill development and believes that S.A. could advance in habilitation if he were placed in a six-person home in the community. Hamilton added that S.A. would benefit from the increased opportunities for socialization and individual attention available at a smaller facility.
The court did not abuse its discretion in concluding that appellees presented clear and convincing evidence that S.A. met the "eligible for conditional release" standard.
Affirmed.
NOTES
[1] DMH represents in its brief that in all future cases it will send notification at the time the application is filed. We recognize that there may be policy reasons for notifying parents and guardians earlier in the process, but the law does not compel this procedure.
[2] Legal Aid represents in its brief that S.A. is indigent and that his parents are the representative payees of S.A.'s public benefits.
[3] Since we conclude that the court had no affirmative obligation to interrogate the guardian ad litem as to whether she made a conscious choice between retained and appointed counsel, we deny appellee Legal Aid's motion to dismiss part one of appellee DMH's brief.
[4] In re M.G. discussed 18 V.S.A. § 8810(f) (1978), which is identical to the current version at 18 V.S.A. § 8834(f). 137 Vt. 521, 526, 408 A.2d 653, 656 (1979).
[5] Appellee DMH asks the Court to reconcile M.G.'s "best interest of the student" test, with the words of 18 V.S.A. § 8834(e): "least restrictive environment reasonably available to meet student's needs." No resolution is needed. Both criteria should be applied. Accordingly, we deny Legal Aid's motion to dismiss part four of DMH's brief. Appellees agree that S.A. met the "eligible for conditional release" standard.